Filed 7/15/15  In re Isabella R. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re ISABELLA R. et al., Persons Coming Under the Juvenile Court Law. | B259257<br><br>(Los Angeles County<br>Super. Ct. No. DK01626) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>MARY M.,<br><br>　　　Defendant and Appellant. | |

　　　APPEAL from the orders of the Superior Court of Los Angeles County.  Timothy R. Saito, Judge.  Affirmed.

　　　Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

## SUMMARY

Mary M. (Mother) appeals from the juvenile court's jurisdictional order under Welfare and Institutions Code[1] section 300, declaring her two children, Isabella R. and Allison R., to be at substantial risk of harm as a result of her efforts to conceal Isabella from the Los Angeles Department of Children and Family Services (DCFS) and her mental health history. Mother also appeals from the court's order removing the children from her custody under section 361. We affirm.

## STATEMENT OF FACTS AND PROCEDURE

On October 4, 2013, DCFS filed a section 300 petition on behalf of Isabella (born in August 2012) alleging in two counts that Mother placed Isabella at risk. In count b-1, DCFS alleged Mother had "mental and emotional problems including a diagnosis for Major Depression, severe, suicidal ideation, suicide attempts and self mutilation behaviors. On multiple prior occasions mother was hospitalized for the evaluation and treatment of the mother's psychiatric condition. The mother failed to take the mother's psychotropic medication as prescribed." In count b-2, DCFS alleged that Mother placed Isabella in "an endangering and detrimental situation in that on or about 8/13/13, the mother left her home with the child to intentionally conceal the child from DCFS for over six weeks. The mother and child's current whereabouts is [*sic*] unknown." The petition listed Cesar R. (Cesar) as Isabella's alleged father and indicated that his whereabouts were also unknown.

Also on October 4, 2013, DCFS filed a Detention Report explaining Mother's DCFS history as a minor. In January 2010, Mother's school contacted DCFS because of a lack of supervision for Mother (who was 14 years old at the time) by Mother's mother (maternal grandmother or MGM) and noted Mother's earlier suicide attempt and resulting in hospitalization in November 2009. Attached to the Detention Report was a hospital admission report showing that Mother had two previous psychiatric

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

hospitalizations at the same hospital and was currently being hospitalized again in June 2010 after recently running away, having suicidal thoughts with plans to use a razor to cut herself or to overdose on drugs, as well as threatening her sister with a knife. A report from a different hospital showed Mother was involuntarily hospitalized in July 2010 for "depression and drugs," after prematurely leaving court-ordered drug rehabilitation and reportedly stabbing herself with a pencil and overdosing on pills.[2] Mother reported "hearing whispers" and not sleeping for two weeks.

In October 2012, while Mother's own DCFS case was still open, then-17-year-old Mother ran away from MGM's home with Isabella, who was two months old at the time. Cesar claimed that he and MGM had tried unsuccessfully to locate Mother with friends and family, but declined to provide DCFS with his address and claimed not to have a phone number. About a month after Mother ran away, a social worker asked MGM about Mother and was told that Mother had contacted MGM a few times to inform her that Mother and Isabella were okay. Mother would not disclose to MGM her whereabouts and refused to contact her social worker. Rather, Mother told MGM that "she was not going to allow anyone to find her and the baby until she turns 18, when she would be able to prove to everyone that she has been capable of caring for her baby."[3]

Mother and Isabella's whereabouts remained unknown to DCFS[4] and, in August 2013 when Mother turned 18 years old, DCFS generated a referral for Isabella due to the termination of jurisdiction for Mother and concerns about possible neglect of Isabella due to Mother's uncertain mental health status.

At an October 4, 2013 hearing, the juvenile court ordered Isabella detained, issuing a protective custody warrant for Isabella and an arrest warrant for Mother to

---

[2] Mother denied overdosing, stating that she sniffed pills and swallowed glue.

[3] Soon after MGM informed DCFS of her contact with Mother, MGM's telephone number was disconnected and MGM's whereabouts also became unknown.

[4] Cesar's whereabouts were also unknown.

become effective if Mother was not found by October 18, 2013.  On October 18, 2013, Mother had not been located and the juvenile court issued the arrest warrant.

On May 7, 2014, the juvenile court placed the matter on calendar after "the court was informed that the mother was released from incarceration on bail in regard to the warrant issued out of this court."  The court found Cesar to be Isabella's presumed father, but found that "it is detrimental to return the child to the custody of the father and that it is not in the child's best interest at this time."  The court, however, granted DCFS discretion to release the child to Cesar "if appropriate" and to detain Isabella in the home of any appropriate relative or non-related extended family member.  The court ordered monitored visits for both Mother and Cesar.

On May 13, 2014, DCFS filed a new original section 300 petition on behalf of Allison R. (born September 2013) against Mother and Jonathan R., Allison's alleged father.  This petition made substantially the same allegations as the prior petition on Isabella's behalf in counts b-1 and b-2, but added in count b-1 the allegation that Jonathan "knew of mother's mental health issues and failed to protect the child in that [Jonathan] allowed the child to be in mother's care and supervision" and added a count j-1 based on Mother's leaving home with and concealing Isabella.[5]

Also on May 13, 2014, DCFS filed a detention report with respect to Allison. Mother told DCFS she had not taken her medication nor received mental health services in over two years, stopping in 2012 when she was pregnant with Isabella.  According to Mother, "the court ordered her" to stop due to her pregnancy.  Mother did not resume her medication or seek psychiatric services because "she feels she is doing well without them."  Mother admitted consuming alcohol but denied using cocaine more than once. Mother claimed not to have used drugs in three years.

When Isabella was detained on May 7, 2014, a DCFS social worker noticed superficial cuts on her abdomen, right leg and left palm.  Mother told DCFS that

[5] In terms of count b-2 and j-1, the petition on Allison's behalf alleged that she was at risk of harm based on Mother placing Isabella in an endangering and detrimental situation when Mother concealed Isabella on or about August 13, 2013.

4

Isabella's crib had a loose screw on a drawer and Isabella constantly cut herself trying to climb over the crib and pointed out a screw with tape around it. MGM explained that Isabella cut herself because she liked to play shirtless outside by the rose bushes.

Jonathan admitted he was aware of Mother's mental health and substance abuse, including that Mother "ha[d] not been taking her medications [and] had an open case." Jonathan shared with DCFS that he "had concerns of his own about [Allison] being under mother's care," but that he still leaves Allison with Mother because he has to go to work.

On May 13, 2014, the juvenile court found Jonathan to be the presumed father of Allison, detained Allison from Mother and Jonathan, and ordered monitored visits for both. The court ordered DCFS to investigate the possibility of releasing Isabella and Allison to their respective fathers.

A Pre-Release Investigation filed on May 27, 2014, reported an interview with Jonathan. Jonathan also had a son who resided with his mother. Jonathan met Mother on October 31 of 2011.[6] He was "with" Mother for "6 to 7 months" before the relationship ended in December 2013[7] when Mother resumed a relationship with Cesar. When Allison was born, Mother reported the father to be Cesar but when Allison was two months old Jonathan had a DNA test done and it showed Jonathan to be Allison's father. Jonathan does not have a current relationship with Mother. Jonathan wanted Allison to reside with him in his care and custody. DCFS noted some safety hazards in Jonathan's home that needed to be remedied.

On June 10, 2014, DCFS filed a Last Minute Information for the Court reporting that Mother stated that during her pregnancy, an ultrasound showed that Allison's left kidney was "not working" but Allison had "never been seen" by a doctor for her "kidney issues" as recommended by her physician at her birth. Mother missed the appointment

---

[6] Jonathan was unsure if the year was 2011 or 2012.

[7] Jonathan may have been mistaken about the year his relationship with Mother ended as Allison was born in September 2013, three months before the date he gave as the relationship's end, but Jonathan stated he was not at Allison's birth because he was unaware that Mother was pregnant.

with the urologist but noted that "It's fine because her right one works." Mother told Jonathan of the kidney issues and he was "supposed" to help address Allison's medical needs.

Jonathan stated that Mother told him about Allison's kidney and that Allison was supposed to be on pills. Allison, however, had never taken the pills. Jonathan knew about the missed appointment with the urologist, replying that he and Mother disagreed about who was supposed to take Allison.

A Pre-Release Investigation filed on June 10, 2014, reported interviews with Mother and Cesar. Cesar and Mother were in a relationship but Mother had moved out in the hopes that Isabella would be placed in Cesar's care and custody.[8] Cesar lived with MGM, a friend, and MGM's companion. Cesar said that Mother still frequented the home since Isabella was not currently placed there. If Isabella were released to Cesar, his plan was to have MGM care for Isabella when he worked.

With respect to the allegation that Mother placed Isabella in an endangering or detrimental situation when she left MGM's home on August 13, 2013, and concealed Isabella from DCFS, Mother explained she took Isabella with her to visit a friend, Juan, but he "held me hostage. He would beat me up and choke me. He wouldn't let me leave, he wouldn't let me out by myself or he kept threatening me that he was going to keep Isabella." She did not remember how long she was with Juan, but at some point Juan's mother gave her money to leave and Juan finally "let me out of his sight." Mother found MGM and Cesar, contacting Cesar through Facebook, and moved in with MGM.[9] MGM

_____

[8] Mother reported living with a cousin, but did not provide the dependency investigator with the cousin's information or home address. Mother planned to continue to use MGM's address as her mailing address.

[9] While Mother lived at MGM's home, Cesar was at the home "all the time, almost like he lived there too." Mother and Cesar broke up and she started a relationship with Jonathan but ended it because, although Jonathan was good to Isabella, he did not treat her as his own child. Mother and Cesar reconciled and moved in with MGM. "Mother would not provide specific information as to the timeline of her initial disappearance with [Isabella], the timeframe with Juan [], when contact was made with

6

scared Mother by telling her "they would take" Isabella and Mother found out about the warrant a couple months later. Mother and Cesar did not use Isabella's identifying information (such as her medical card, social security number, and food stamps) to "prevent you . . . from finding us."

Cesar told the dependency investigator that Mother "ran away because she was scared" DCFS would take Isabella and that Mother made the decision one day before a court appearance. Cesar lost contact with Mother and could not locate her. He finally located her about two weeks later on Facebook and they met once. About a month later, Mother came to Cesar and they went to live together at his brother's house for about two months. Father would not respond when the dependency investigator inquired as to father notifying DCFS, dependency court or law enforcement when mother and child were located.

With respect to her mental health, Mother reported she last saw a therapist while in DCFS care at the age of 17. Mother was diagnosed with depression and bipolar disorder and was prescribed psychotropic medication, but stopped taking the medicine while pregnant with Isabella and had not resumed after her birth. Mother reported no current symptoms. Mother admitted consuming alcohol and aerosol from a spray can to "get attention." She stated she was willing to comply with a full mental health assessment to determine her current mental health status and need for psychotropic medications. Cesar acknowledged being aware from Mother that she was diagnosed as bipolar and had been prescribed psychotropic medication which she discontinued after Isabella's birth. Cesar was also aware that Mother had discontinued psychiatric treatment after Isabella's birth. After Isabella's birth, however, "everything changed" and Mother no longer had mood swings, anxiety or any problems. In terms of protecting Isabella in light of Mother's mental health history, Cesar said he took care of Isabella, was scared Mother would run away with Isabella when she had no place to go, and believed Mother was committed to resolving her issues to regain custody.

father Cesar [], timeline as to the parent's relationship, and the timeline as to when they moved in together."

7

DCFS noted some safety hazards in Cesar's home that needed to be remedied. DCFS also expressed concern about Cesar's ability to protect Isabella given his and MGM's failure to disclose Mother and Isabella's whereabouts once they were located.

DCFS filed three Last Minute Information for the Court forms on June 10, 2014. The first one reported that Mother was in Cesar's home during all visits by the dependency investigator and DCFS was still unable to verify Mother's current address. The second one reported that Jonathan had only had one visit since Allison's placement and that a background check for a family friend who was a potential caregiver was still incomplete. The third one reported on unresolved deficiencies in Jonathan's housing.

On June 10, 2014, the juvenile court ordered Allison released to Jonathan and Isabella to remain detained.

On June 27, 2014, DCFS filed a Jurisdiction/Disposition Report for both Isabella and Allison. In addition to reiterating information in prior reports, DCFS interviewed Jonathan. When Jonathan met Mother, she was "stressed out." Jonathan, however, denied any knowledge of Mother's mental health issues, including diagnosis and medication recommendations, saying that he did not think Mother was a danger to Allison and just thought Mother was angry at MGM and some friends. Jonathan denied knowing about Mother abducting Isabella, saying that he found out about the incident through DCFS's case.

Mother provided a letter from the Los Angeles Department of Mental Health's Women's Community Reintegration Services and Education Center dated June 13, 2014, noting that Mother had been seen by a mental health professional but determined not to meet medical necessity at that time to receive services.[10] DCFS noted, however, that the evaluating mental health professional did not have access to Mother's DCFS history and reports.

DCFS filed two Last Minute Information to the Court forms on June 27, 2014. The first one reported that Jonathan was having "extensive difficulty with securing day

[10] A copy of the letter is attached to the Jurisdiction/Disposition Report.

8

care services" for Allison, causing him to miss work and consider terminating his employment. The second one reported that the dependency investigator had visited Mother's home with her cousin, but was concerned that Mother may not be living at the address given her limited belongings in the apartment and the apartment manager's inability to verify that Mother resided at the address.

On June 27, 2010, the juvenile court ordered Isabella released to Cesar, over DCFS's objections, and on the condition that Mother not reside in the home.

On June 30, 2014, DCFS filed a First Amended Petition, against Mother and Cesar, adding count b-3 which alleged that Cesar concealed Isabella's whereabouts after Mother left home on August 13, 2013, thereby endangering Isabella.

At the June 30, 2014 jurisdiction hearing—which continued on July 1, 2 and 3, 2014—the court dismissed the original petition as to Isabella and received the first amended petition. The court then admitted into evidence various DCFS reports and heard testimony from Mother and Cesar.

Mother testified to the following: Her mental health problems began when she was 13 years old and going through a phase where she was out of control, thinking suicidal thoughts and emotionally depressed. She was diagnosed with bipolar disorder and depression, and her behavior included running away, not listening to others, and not showing emotions. She was on medication to control her symptoms and was hospitalized. She was transferred to "rehab," and spent several months at two placements until her "graduation"—meaning "you're not a danger to yourself as you were before." Mother left placement and became pregnant with Isabella when she was 16 years old. Because the pregnancy was high-risk, she stopped taking psychotropic medication based on the recommendation of a doctor her social worker took her to see. After Isabella's birth, a doctor who checked her said she did not need medication at the time so she did not resume taking it. On cross-examination, Mother conceded that the doctor asked for more information, specifically Mother's past records, to follow up but Mother ran away before the follow up occurred. She has not experienced any mental or emotional issues since she left placement and gave birth to Isabella. Mother saw a different doctor two

weeks ago and disclosed her previous diagnosis and told him to talk to her social worker if he wanted additional information. The doctor concluded Mother did not meet "his necessity to be evaluated as a mental health patient" and did not have any symptoms.

In October 2012, Mother left and "ran away" from MGM's home for a month with Isabella. Mother went to visit Juan "and was going to come back home that same day" but Juan would not let Mother out the door. Juan would hit Mother when Mother would try to leave with Isabella. Mother "would never hold Isabella when [Juan] would hit [her]"; instead Isabella would be in the living room with Juan's mother while Juan hit her in another room. When Mother returned, MGM had been evicted and Mother could not find her, so Mother lived with Cesar until locating MGM at the end of November. In December 2012, Mother moved back in with MGM. Mother denied that she ever tried to hide from DCFS or that MGM ever tried to hide Mother's location. When Mother returned, she tried contacting her social worker but "there was no answer, and they told me that it was a different social worker." MGM had not had any contact from DCFS. Mother thought her case was "done" and was unaware that the court issued a warrant for her arrest. Although Mother stated in this case that she "thought about" not using Isabella's identifying information to hide her, she never said that she actually did so.

Mother would abide by the court order that she could not live with Cesar.

Cesar testified to the following: Throughout 2013, Cesar lived with Mother, Isabella and MGM. Cesar never concealed Isabella's whereabouts from DCFS and did not know about the warrant for Mother's arrest until her arrest in April 2014. He was aware of Mother's mental health history and that she had a case with DCFS when she ran away. Cesar did not contact DCFS when he found Mother. Mother never told Cesar that she was planning on using different medical information so DCFS would not know where Isabella was.

After argument, the juvenile court sustained counts b-1 and b-2 in both petitions with respect to Mother's conduct, but struck the sentence alleging Jonathan failed to protect and dismissed count b-3 in the amended petition against Cesar for concealing

10

Isabella.[11] The court amended the petitions to reference Mother's mental health problems as "unresolved" in both b-1 counts. The court explained that Mother's testimony was "very helpful and insightful" in establishing a "nexus" between Mother's mental and emotional health and risk of future harm to Isabella and Allison because her emotional issues manifest in running away, "awoling," not wanting to communicate, and wanting to be alone—which is "just what she did in this case." Specifically, Mother's emotional issues resulted in Isabella being subjected to domestic violence between herself and Juan that included Juan hitting, choking and threatening Mother as well as holding her and Isabella hostage. The juvenile court found that Mother had a pattern of wanting to be alone and "awoling" and "this time took the child with her and affected this child. And unless she gets the treatment that she needs, this could happen again." The court found a "direct correlation" between Mother's "untreated emotional issues" and the "care of the child." The juvenile court also noted credibility issues with Mother's testimony that a doctor told her she was fine.

The court found that Mother intentionally left and was concealing Isabella, which was "very troubling," and that in her effort to conceal Isabella, Mother did not use her medical card, food stamps or social security card—"all [of] which go[] to the care of the child in this case, which was derelict on the part of the Mother." The court also noted Allison's "untreated medical issues" which the court tied to concealing the child and putting the child at risk.

The court continued the disposition hearing for receipt of a section 730 evaluation for Mother.

On August 13, 2014, DCFS filed a Last Minute Information for the Court summarizing and attaching a 730 Psychological Evaluation report by Dr. Nadim Karim. Dr. Karim reported the following: She reviewed DCFS documentation and interviewed Mother but did not have access to Mother's mental health records. Dr. Karim was concerned that Mother "appears to have 'self-diagnosed' that she no longer requires any

---

[11] The court also sustained count j-1 in Allison's petition.

11

psychotropic medication without first consulting a psychiatrist." In terms of Mother being assaulted and held hostage by Juan, Mother "may have unresolved symptoms of traumatic stress that also require individual therapy" and "further suggests that the child, Isabella, was possibly exposed to the physical assaults." In Dr. Karim's opinion, Mother "does not appear to pose a direct physical or emotional threat to her children. However, there is still the possibility of threat of harm to herself, as well as the potential for running away again with her children (which appears to be a repetitive pattern for her)–thus putting the children at current risk." Dr. Karim recommended a second opinion with a psychiatrist familiar with her history and that such an evaluation be completed "prior to any change in her current visitation status."[12] Dr. Karim also recommended several clinical interventions.

On August 13, 2014, the juvenile court continued the disposition hearing in order for Mother to obtain a second evaluation. The court ordered Mother to submit to a full psychiatric evaluation.

On September 29, 2014, DCFS filed a Last Minute Information for the Court reporting that two weeks earlier Mother had gone to make an appointment at West Central Mental Health for a psychiatric evaluation but claimed she was told, "'she does not show symptoms and therefore cannot be evaluated.'" DCFS was unable to communicate with staff at the center to determine if Mother disclosed her history or current concerns. DCFS also reported that Mother was not attending scheduled DCFS-monitored visits with the children and expressed concern that Cesar and Jonathan might be allowing Mother to visit without DCFS approval.

At the September 29, 2014 disposition hearing, the juvenile court received into evidence DCFS reports and a certificate of completion for Mother of a parenting program.

_____

[12] Dr. Karim recommended that "DCFS should consider unmonitored visits after [Mother] can display that she complied with outpatient treatment as deemed necessary by the evaluating psychiatrist (including a medication review)."

After argument, the juvenile court indicated that it was looking for "some kind of proof that [Mother] addressed her psychiatric evaluation, but all I have is Mother's statement . . . that she went to be evaluated and that she was symptom[] free."[13]  Based on the lack of proof that Mother was symptom free and the 730 evaluation and Mother's testimony that she runs away and looks inward, "the court feels that here is still a risk until we get some kind of indication that Mother is attempting to address these issues."  The juvenile court then declared the children dependents of the court, removed them from Mother's custody and ordered them released to their respective fathers.  The court ordered Mother to participate in a parenting program, mental health counseling, psychiatric evaluation, individual counseling under the supervision of a licensed therapist, and to take all prescribed psychotropic medication.  The court also ordered follow-up for Allison's kidney issues.  The court ordered monitored visits for Mother with DCFS discretion to liberalize.

Mother appealed.

## DISCUSSION

On appeal, Mother contends that the jurisdictional findings were not supported by substantial evidence, because Mother's mental and emotional issues did not place the children at substantial risk of harm.  Specifically, Mother contends that the situation with Juan was a "one-time incident of poor judgment" and there was "no evidence whatsoever that Isabella witnessed" the domestic violence.  Mother further contends that, even assuming Mother's mental health concerns posed a risk or harm to her children, the juvenile court should not have asserted jurisdiction because the respective fathers stepped forward to care for the children, eliminating the necessity of juvenile court jurisdiction.  Finally, Mother contends that substantial evidence did not support removing the children

---

[13] The court noted that at the jurisdictional hearing, Mother stated that she was cleared by a doctor but could not provide any proof, saying she did not remember the name of the doctor and all paperwork was lost when MGM was evicted, concluding "Again.  No proof."

from Mother's home when the court had the alternative of requiring Mother to reside in MGM's home where MGM and Cesar would be two "extra" pairs of eyes on Mother and Isabella.

"The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm." (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134.) At the jurisdiction hearing, "[p]roof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300." (§ 355, subd. (a).)

"In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

"On review, we employ the substantial evidence test, however bearing in mind the heightened burden of proof" at the trial level of clear and convincing evidence for the removal of a child. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)

Under section 300, subdivision (b), jurisdiction is appropriate where the court finds "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's . . . substance abuse."

Viewing the evidence in the light most favorable to the juvenile court's determinations and deferring to the court's credibility determinations, we affirm. Mother had a history of running away and a mental health history that included several

14

involuntary hospitalizations, drug use, depression, bipolar disorder, and suicidal ideation. Mother discontinued taking her psychotropic medication and her treatment around the time of her pregnancy with Isabella. The juvenile court found Mother's claim not to be credible that a doctor told her that she did not need to take psychotropic medication after Isabella's birth. Mother ran away with Isabella in 2013 and had a violent incident with Juan, during which Juan physically assaulted Mother, held Mother and Isabella hostage, and threatened to take Isabella from Mother.[14] Mother concedes that Mother "did place herself in a situation that was potentially harmful" because Juan used physical violence to prevent her from leaving, but she argues that it was a "one-time incident of poor judgment." The evidence, however, supports the conclusion that running away was a pattern with Mother. Mother testified about her mental health diagnosis and that some of her behaviors that caused concern included running away, not listening to others, doing "stuff that wasn't right," and not showing emotion. Mother's hospitalization records showed that she had run away on prior occasions. And Cesar expressed to DCFS that he was scared Mother would run away again with Isabella.

Moreover, the juvenile court did not find Mother's claim credible that she was not hiding from DCFS or concealing Isabella from DCFS. Mother's statements to DCFS supported the court's conclusion that Mother did in fact conceal Isabella and purposely did not use her medical card, food stamps or social security card to care for her children in order to conceal them. During the time she was concealing Isabella from DCFS, Mother also failed to obtain follow-up medical treatment for Allison's kidney issue.

Mother's situation is, thus, distinguishable from the cases she cites where no jurisdiction was found. (Compare *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1319 [parent "consistently obtained medical treatment for the children" and "voluntarily participated in extensive therapy for herself over the years"]; *In re David M.* (2005) 134 Cal.App.4th 822, 827 [parents "obtained regular, appropriate medical care" for their

_____

[14] Mother asserts that there was no evidence that Isabella witnessed Juan's physical violence against Mother. Juan, however, did threaten to take Isabella from Mother if she tried to leave and effectively held Isabella, along with Mother, hostage.

children]; *In re James R.* (2009) 176 Cal.App.4th 129, 133 [parents were "very attentive to the minors' . . . medical needs" and parent had voluntarily initiated services before social services agency involved].)

Accordingly, substantial evidence supported the juvenile court's jurisdictional finding.

Next, Mother argues that even if Mother's conduct placed the children at risk or harm, the juvenile court should not have asserted jurisdiction because the respective fathers had stepped forward to care for the children, eliminating the necessity of juvenile court jurisdiction. The case relied upon by Mother is distinguishable. In *In re A.G.* (2013) 220 Cal.App.4th 675, although mother was unable to care for the children due to her mental illness, the father had shown "remarkable dedication" and shown he was able to protect the children from mother's mental illness by ensuring that there was adult supervision, other than mother, of the children at all times and the one time mother was left alone with the children no harm was reported. (*Id.* at p. 684.) Here, while Isabella was in Mother's care, she ran away and the incident with Juan, discussed above, occurred. As to Allison, Jonathan stated that despite his concerns he left Allison in Mother's care because he had to work.

Finally, Mother argues that the court had the alternative of requiring Mother to reside in MGM's home where MGM and Cesar would be two "extra" pairs of eyes on Mother and Isabella. We conclude that substantial evidence supported the juvenile court's determination to remove the children from Mother's care. In addition to the evidence available at the jurisdictional hearing, the juvenile court also received the 730 Psychological Evaluation report by Dr. Karim. Dr. Karim opined that "there is still the possibility of threat of harm to herself, as well as the potential for running away again with her children (which appears to be a repetitive pattern for her)—thus putting the children at current risk." Dr. Karim recommended a second opinion with a psychiatrist familiar with her history and that such an evaluation be completed "prior to any change in her current visitation status." Mother, however, did not submit to full psychiatric evaluation as ordered by the court. Rather, Mother claimed to be told that she could not

16

be evaluated because she had no symptoms, but the court did not find this evidence to be convincing proof that she was symptom free. Moreover, the evidence showed that Mother had previously run away from MGM's home on several occasions, including the 2013 incident when she took Isabella with her. The juvenile court could have reasonably concluded that "extra" eyes would not prevent Mother from running away again and taking the children with her.

## DISPOSITION

We affirm the juvenile court's findings and orders.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

JOHNSON, J.

17